# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

CATHERINE DARLING, KARA ALBACH,
CARISSA ALBERTS, LIZANNE ALVAREZ,
SHAWNA AUSTIN, JORDYNN AVERIETT-
TALLEY, LISA BAKER, LORIS BAUGH,
REBEKAH BAUGH, JEFFREY BEARD,
KRISTEN BECKER, KITTIMA BEGIER, ANISE
BENNETT, TIFFANY BILYY, DONNA
BODNER, TIMOTHY BOYETT, KELLI
BRADDOCK, REBECCA BRADLEY, OLIVIA
BRASWELL, JOSHUA BROWN, TRACY
BURNHAM, MELINDA CHAMBERS, ALESA
CLARK, JOY CONNER, ERNIE CYR, BROOKE
DAVIS-PERRY, DAWN DEKARD, REBECCA
DIGANGI, JORDAN DILAURO, TRACIE
DOVE, LAVONNE DOWNING, SCOTT
DUNKLEY, ROSE DUNN, HERBERT
DUPREE, ERIKA EDDINS, MELISSA
ELLINGTON, MELISSA ELLIOTT, EDWARD
ERNST, ANGELA ESPINOSA, AMY FARLEY,
KRISTINE FAULK, TAMMY FELL, ADRIA
FORBES, WENDY GARCIA, SHARLETT
GATHERS, BRANDI GEOGHAGAN, JEFFERY
GERKEN, DEBRA GILLIS, TERESA GOLDEN,
NAOMI GOLINO, MICAH HALLMAN,
ELIZABETH HAMILTON, RENA
HARDIMAN, CARLEIGH HARRISON,
BARBARA HATTAWAY, LADORA HAUPT,
RONDA HEAD, JUDITH HEGGDAL,
CHRISTOPHER HELENTHAL, PAUL
HERNANDEZ, LORI HOGAN, MARCUS
HOLLERS, ANDREA HOUGLAND, JANINE
HUNT, EDDIE HYATT MD, AMANDA
JACKSON, STEVE JOHNSON, BARBARA

Case No. _____





KARLOVICH, AIMEE KELLER, TRISTAN
EDWARD KLIP, PAOLA KRISTUFEK, MARY
LAFSER, LAURA LANDRIEU, JASON
LANGFORD, PAMELA LANGLEY, LAURA
LATELY, MARGARET LAZAR, DORIS (J.)
LEARY, RIEFLER LEE, ATHENA LEMAY,
KATHERINE LONG, RACHEL LOVELY,
KATHERINE MADIGAN, GARY "KEVIN"
MAHER JR, ROBERT MAJOR, KRISTINA
MARTIN, STEPHANIE MASAT, BREANA
MATZEN, ANN MAULBECK, CAMERON
MCCAIG, KRISTY MCCLINON,  LISA
MCKINLEY, DONNA MCLENDON, TRICIA
MITCHELL, SAUNDRA MOOR, LISA
MORTON, MICHELLE MOSLEY, KELLY
MOTES, TAMMY NELSON, ALICIA
NETTLES, MARSHA NORRIS, VIRGINIA
O'BERRY, TABATHA OUELLETTE,
CAROLINE PAPAGEORGE, KIRSTEN
PATTON, MICHELLE PAULSON,
SHANNON PEPPERDENE, DEAN PLATT,
PATRICIA POTTS, SANDY PRICE, ASHLI
PUTTBACH, BAILEY RAY, JASON
RICHARDS, JENNIFER RICHARDSON,
KRISTINA RIJO, MELISSA ROBERTSON,
ALMA MARIE RODRIGUEZ, ALADION
ROLDAN, ALEXANDRA ROLDAN, JOANNE
SAJOWITZ, MORGAN SALO, MARTHA
SANCHEZ-SILVA MD, CHERISE SANDERS,
MICHAEL KEITH SARTIN JR., PAM SASSER,
KENDRA SCARBERRY, BONNIE SCHMIDT,
DENISE SEIGLER, NOPHIE SEVERNS, LYNN
SHORTINO, ANTONIO SILVA, LLOYD
SLOAN, CHRISTY SMITH, CONSHONDRA
SMITH, MICHELLE SNOW, JACEY
SOKELAND, DARNITA SPANN, LESLIE
STREET, CHAINA STRENGH, CAMDIDO



"TREY" SUAREZ, RYAN SULLIVAN, GLEN
SUMMERS, TRISA SUTTON, MICHAEL
SWEENY, JENNIFER THOMAS, ROBERT
THOMPSON, ELIZEBETH TOWNLEY, KARA
TREMATERRA, SARAH TURNER, SHERIF
TWEFIK, JOHNNY VASQUEZ, STACEY
VAUGHN, SVETLANA VOLOSHCHUK,
CYNTHIA WALKER, MARIA WALLS, ANNA
WESTERMAN, MATTHEW WILKERSON,
RUTH WILKERSON, CASEY WILLET,
TANYA WOLFF, BRITTANY WOOLFORD,
LISA WRAGG, PAIGE YARBOROUGH,
SHANNON YOUNGBLOOD

   Plaintiffs,

v.

SACRED HEART HEALTH SYSTEM, INC., a
Florida nonprofit corporation, ST.
VINCENT'S HEALTH SYSTEM, INC., a
Florida nonprofit corporation, ST.
VINCENT'S MEDICAL CENTER-CLAY
COUNTY, INC., a Florida nonprofit
corporation, ST. VINCENT'S AMBULATORY
CARE, INC., a Florida nonprofit corporation,
ST. VINCENT'S MEDICAL CENTER, INC.,  a
Florida nonprofit corporation, ST. LUKE'S-
ST. VINCENT'S HEALTHCARE, INC., a
Florida nonprofit corporation, and
ASCENSION HEALTH ALLIANCE, a
Missouri non-profit corporation,

   Defendants.

_____/



## VERIFIED COMPLAINT FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

COME NOW Plaintiffs, requesting the Court enter declaratory judgments for Plaintiffs and immediately enter a TRO (with notice) and/or an emergency preliminary injunction pursuant to Fed. R. Civ. P. 65, forbidding the Defendants and their agents, affiliates, subsidiaries, and all persons acting in concert with them, from terminating or disciplining the Plaintiffs for failing to comply with Defendants' Mandatory Vaccination Policy, and saying:

### Introduction

The Biden Administration began its aggressive campaign to vaccinate every American in July, focusing on private employers as a key part of its national strategy. By July 28, 2021, Ascension — the second-largest hospital chain in the country, with half or more of its revenue controlled by the federal government, and now addicted to billions of dollars in CARES Act pandemic funding — fell into line, and ordered its employees to be vaccinated for Covid or seek employment elsewhere. It also cancelled all existing vaccine-related religious exemptions — longstanding exemptions



that it had been routinely granting for years. It told employees to re-apply in the fall for those previously-approved, longstanding exemptions.

When the employees re-applied in the fall, they were provided with a brand-new website for exemption requests, combining the previous process for obtaining flu vaccine exemptions with the new Covid vaccine requirement. The new "exemptions portal" had a novel feature: a box that employees had to check in order to submit their exemption request. The box said the employees agreed that, if their requests were denied, then they would "voluntarily resign." Check the box to proceed.

Ascension then summarily denied all or nearly all employee exemptions.[1]

Unsatisfied with employee mandates, Ascension followed the federal government's lead and also required all contractors and providers to mandate vaccination, or else their contracts would be terminated, creating a daisy-chain of coerced, unwanted medical treatments forced on ordinary, law-abiding Americans under threat of severe economic dislocation.

---

[1] Since receiving the Plaintiffs' demand letter a couple weeks ago, Ascension has started "re-considering" exemptions and approving a few here and there, in a transparent attempt to defend its indefensible conduct.

Ascension's timing is not terrific. Florida now has the lowest Covid-19 infection rate in the United States. The survival rates for Covid-19 infected patients between the ages of 20 and 50 — like the majority of the Plaintiffs — is over 99.98%. Even between ages 50 to 70 it exceeds 99.5%. These statistics include infected people at high risk for Covid mortality. The Plaintiffs — all frontline healthcare workers — are much healthier overall than the general population. Many of them have already acquired natural immunities to the disease from on-the-job exposure. The Plaintiffs' chances of survival are much higher even than the stock figures.

In other words, Ascension's Vaccine Mandate offers no statistical benefit to its hospitals in terms of reducing mortality over baseline levels. The vaccines do not prevent transmission. There is no rational basis for Ascension's coercive policy except that it is being compelled to do so by the federal government, and it has agreed to help the federal government effectuate a broad national public health objective.

Like the employees whose livelihood is being threatened by Ascension, Ascension's livelihood is being threatened by the federal government.

Because the federal government cannot directly mandate vaccines — that would be an unconstitutional invasion of the right to privacy and bodily autonomy — it has created a web of related and unrelated federal threats, bribes, incentives and sanctions designed to coerce private actors like Ascension to do what it cannot: require citizens to accept unwanted medical treatments.

The Ascension Group's Vaccine Mandate does not further the hospitals' mission of treating individual patients. Instead, it implements and furthers the traditional government job of broad public health management by effectuating delivery of federal property (the vaccines) into the bodies of private citizens. The Defendants are not acting voluntarily, but rather have been massively incentivized and coerced into implementing the government's policy through its Vaccine Mandate — trampling Plaintiffs' state and federal statutory and constitutional religious liberties and privacy rights.

## Jurisdictional Allegations

1.      This Court has jurisdiction to hear this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States, as well as



under 42 U.S.C. § 1983 relating to Defendants' intent to deprive Plaintiffs of certain rights, privileges, and immunities.

2.     This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201, the requested injunctive relief under 28 U.S.C. § 1343(a), and attorneys' fees and costs under 42 U.S.C. § 1988.

3.     The Northern District of Florida is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the district in which Defendant Sacred Heart Health System, Inc. resides, and because Ascension Health is a foreign corporation subject to long-arm jurisdiction in Florida. It is also the district in which a substantial part of the events giving rise to Plaintiffs' claims have occurred and continue to occur.

4.     Defendant ASCENSION HEALTH ALLIANCE is a Missouri nonprofit corporation ("Ascension Health"), and may be served via its registered agent CSC-Lawyers Incorporating Service Company, 221 Bolivar St., Jefferson City, MO 65101. This Court has long-arm jurisdiction over Ascension Health since it conducts substantial business activity in Florida

through its local subsidiaries, enjoys a unity of identity with them, and is responsible for implementing the policy giving rise to Plaintiffs' claims.[2]

5.     Defendant SACRED HEART HEALTH SYSTEM, INC. is a Florida not for profit corporation headquartered and operating in Pensacola, Florida ("Sacred Heart"). Sacred Heart may be served at Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525. Sacred Heart employs more than 1,000 workers and is a subsidiary or affiliate of Ascension Health.

6.     Defendant ST. VINCENT'S HEALTH SYSTEM, INC. is a Florida not for profit corporation headquartered and operating in Jacksonville, Florida ("St. Vincent's"). St. Vincent's may be served at Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525. St. Vincent's

---

[2] "Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there." *Consol. Dev. Corp. v. Sheritt, Inc.*, 216 F.3d 1286,1293 (11th Cir. 2000). "On the other hand, if the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the subsidiary's business will be viewed as that of the parent and the latter will be said to be doing business in the jurisdiction through the subsidiary for purposes of asserting personal jurisdiction." *Sehringer v. Big Lots, Inc.*,532 F.Supp.2d 1335, 1338 (M.D. Fla. 2007) (citation omitted) (finding Florida's long arm statute satisfied and finding "sufficient minimum contacts between the [parent corporation] and Florida so as to satisfy 'traditional notions of fair play and substantial justice' under the Due Process Clause of the Fourteenth Amendment," where the "collective activities" of the parent demonstrated that the Florida subsidiary was "a vehicle through which [the parent] conduct[ed] its business"); *see also Keeley v. Airgas, Inc.*, 2008 WL 5422691 at *14 (W.D. Mich. 2008) (citing *Sehringer v. Big Lots, Inc.*, 532 F.Supp.2d 1335 (M.D. Fla. 2007) (finding that parent's "identity [wa]s merged enough with its subsidiaries to be subject to personal jurisdiction").



employs more than 1,500 workers and is a subsidiary or affiliate of Ascension Health.

7.      Defendant ST. VINCENT'S MEDICAL CENTER-CLAY COUNTY, INC. is a Florida not for profit corporation headquartered and operating in Jacksonville, Florida (collectively with all St. Vincent entities, "St. Vincent's"). St. Vincent's may be served at Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525. St. Vincent's Medical Center-Clay County is a subsidiary or affiliate of Ascension Health.

8.      Defendant ST. VINCENT'S AMBULATORY CARE, INC. is a Florida not for profit corporation headquartered and operating in Jacksonville, Florida (collectively with all St. Vincent entities, "St. Vincent's"). St. Vincent's may be served at Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525. St. Vincent's Ambulatory Care is a subsidiary or affiliate of Ascension Health.

9.      Defendant ST. VINCENT'S MEDICAL CENTER, INC. is a Florida not for profit corporation headquartered and operating in Jacksonville, Florida (collectively with all St. Vincent entities, "St. Vincent's"). St. Vincent's may be served at Corporation Service Company,



1201 Hays Street, Tallahassee, FL 32301-2525. St. Vincent's Medical Center is a subsidiary or affiliate of Ascension Health.

10.     Defendant ST. LUKE'S-ST. VINCENT'S HEALTHCARE, INC. is a Florida not for profit corporation headquartered and operating in Jacksonville, Florida (collectively with all St. Vincent entities, "St. Vincent's"). St. Vincent's may be served at Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525. St. Luke's-St. Vincent's Healthcare is a subsidiary or affiliate of Ascension Health.

11.     Together, St. Vincent's, Sacred Heart, and Ascension are collectively referred to as "Ascension Group."

12.     Plaintiffs are 164 healthcare workers who work for or contract with the Ascension Group and are subject to those firms' employment policies, including the employment policy at issue in this case.

13.     Many of the Plaintiffs are already Covid survivors who now have durable and long-lasting natural immunity.

14.     The Plaintiffs are frontline healthcare workers who are not essential to the Defendants' spiritual and pastoral mission.



**The Defendants**

15.    Defendants Sacred Heart and St. Vincent's are subsidiaries or affiliates of Defendant Ascension Health.

16.    The Defendants form a corporate network of Catholic hospitals and refer to themselves as religious organizations.

17.    Ascension Health exerts substantial operational control over its subsidiaries, including Sacred Heart and St. Vincent's, as demonstrated by, *inter alia*:

> a) Ascension Health describes itself on its "About" page as a "faith-based healthcare organization," which "includes more than 150,000 associates and 40,000 aligned providers . . .[, and] operates more than 2,600 sites of care – including 142 hospitals and more than 40 senior living facilities – in 19 states and the District of Columbia";[3]

---

[3]*About*,  https://www.ascension.org/About?intent_source=nav_footer&_ga=2.59803301.966244912.1635022096-410706024.1634564202 (last visited Oct. 23, 2021).



b) It maintains a consistent website design and presentation, for itself and its subsidiary hospitals and sites of care, including those for Sacred Heart and St. Vincent's;[4]

c) It implements systemwide initiatives such as its Green Teams which collaborate with Environment of Care committees at each Ascension site of care or hospital "to drive green practices";[5]

d) It uses common suppliers for its sites of care, such as the common Food and Nutrition Services Provider it uses for its hospitals;[6] and

e) It implements common employment policies across the Ascension Health system, such as the vaccination policy at

---

[4] *See* https://healthcare.ascension.org/locations/florida/flpen/pensacola-ascension-sacred-heart-pensacola; https://healthcare.ascension.org/locations/florida/fljac/jacksonville-ascension-st-vincents-riverside/ (last visited Oct. 24, 2021). For example, the "career search" link at the top of both of these pages, leads to a page with a search box for jobs across the Ascension Health system. At this page, there are descriptions of "Life at Ascension," including a common culture, benefit plan description, and mission of inclusion for all Ascension Health "associates." In addition, the map under "Our national network" on the career page highlights Florida as one of Ascension Health's locations.

[5] *See* Fiscal Year 2021 Environmental Impact & Sustainability Report ("Sustainability Report") at p.8, attached as **Exhibit 1**. The Sustainability Report gives examples of how "associates across Ascension helped the planet prosper and addressed climate change," on Earth Day this year, including examples of projects at Ascension Sacred Heart Pensacola and at Ascension hospitals in Jacksonville. *Id.* at 9.

[6] *See id.* at 14.



issue in this suit, which applies to all Ascension "associates," including those employed at Sacred Heart and St. Vincent's.[7]

f) Ascension Health's subsidiaries are organized pursuant to its common corporate purposes. For example, the Amended and Restated Articles of Incorporation of St. Vincent's Health System, Inc. recites that its "purposes shall be consistent with and supportive of the corporate purposes of Ascension Health and Ascension." See Amended and Restated Articles of Incorporation of St. Vincent's Health System, Inc., attached as **Exhibit 2**.

18.    Ascension Health also has a strong unity of financial interest with its subsidiaries, evidenced by its "Community and Investor Relations" page, which contains reports solely on the combined financials of Ascension Health and its subsidiaries as one System,[8] including, as of June 30, 2021, "approximately 150,000 associates and 40,000 aligned care providers, operating more than 2,600 sites of care – including 146 hospitals and more

---

[7] *See For safety of communities, Ascension to require COVID-19 vaccination for associates* (July 27, 2021), https://ascension.org/News/News-Articles/2021/07/27/15/59/Ascension-to-Require-COVID-19-Vaccination.

[8] *See Community and Investor Relations*, https://ascension.org/about/community-and-investor-relations (last visited Oct. 24, 2021).



than 40 senior living facilities – in 19 states and the District of Columbia . . .

.”[9] The Management's Discussion, the Ascension Consolidated Financial Statements and Supplementary Information, attached as **Exhibit 4**, and the Ascension Consolidated Statistical Information, attached as **Exhibit 5**, all provide consolidated data on Ascension Health and its subsidiaries, without differentiating between the data of Ascension Health and that of its subsidiaries. Thus, the picture presented to investors and the public is one of Ascension Health and its subsidiaries as a unified, cohesive, multistate organization.

19.    The Defendants do not require employees to subscribe to any statement of faith.

20.    Ascension Health created the vaccination policy at issue in this case and each of the other Defendants is currently implementing and enforcing the policy.

21.    According to publicly available financial information, Ascension Group received 1.796 **billion dollars** in federal aid related to the pandemic for fiscal year 2020-21. *See* Management's Discussion at p. 7.   Ascension

---

[9] Management's Discussion and Analysis of Financial Condition and Results of Operations for Ascension ("Management's Discussion") at p.1, attached as **Exhibit 3**.



Group reported an operating income of $676 million and an investment-buoyed $5.7 billion net income for the fiscal year ended June 30, 2021.[10] Ascension Group has $15.5 billion in cash and operates a venture capital fund.[11]

22.    In 2019, Ascension Group was ranked the second-largest hospital system in America.[12]

### **The Plaintiffs**

23.    The Plaintiffs are all doctors, nurses, and other healthcare employees or contractors who work for one or more of the Defendants.

24.    As an example of the individual Plaintiffs:

    a) Plaintiff Catherine Darling is an employee of St. Vincent's who resides in Duval County, Florida. She is a sonographer. She recovered from COVID-19 in July of 2020. She applied for a religious exemption to the Vaccine Mandate, based on her

---

[10] *See* "Ascension latest nonprofit to rebound with $5.7B net income for 2021," *available at*: https://www.fiercehealthcare.com/hospitals/ascension-latest-nonprofit-to-rebound-5-7b-net-income-for-2021.

[11]    See   Wikipedia,   "Ascension   (Company),"   *available   at*: https://en.wikipedia.org/wiki/Ascension_(company).

[12] *See* Becker's Hospital Review, "100 of the largest hospitals and health systems in America | 2019," *available at:* https://www.beckershospitalreview.com/largest-hospitals-and-health-systems-in-america-2019.html.



sincerely held religious belief in opposition to being vaccinated for COVID-19, rooted in her Catholic faith. Her request for a religious exemption was supported by two letters from Father Joseph Kuhlman, a Catholic priest at her diocese in St. Augustine, Florida. In the first letter, dated August 30, 2021, Father Joseph Kuhlman notes that "Catherine Darling is a baptized and practicing Catholic who is seeking a religious exemption from an immunization requirement." *See* Father Joseph Kuhlman's First Letter at p.1, attached as **Exhibit 6**. He goes on to "explain[] how the Catholic Church's teachings may lead individual Catholics, including Catherine, to decline certain vaccines." *See id.* In a second letter, Father Kuhlman demands that Plaintiff Darling be exempted from the "unjust imposition of these 'shots.'" *See* Father Joseph Kuhlman's Second Letter at p.1, attached as **Exhibit 7**. Father Kuhlman further states that "[t]ransgressing the domain of conscience and personal moral integrity is a severe form of violence against the dignity of the human person[, and that n]o employer or government official has the right to force a human person to get this said 'vaccine.'"



*Id.* Despite this, St. Vincent's denied Plaintiff Darling's application for a religious exemption from the Vaccine Mandate. St. Vincent's also denied her appeal. If she does not provide proof of vaccination on or before November 12, 2021, she will be placed on unpaid leave and removed from St. Vincent's work schedule.

b) Plaintiff Carissa Alberts is an employee of Sacred Heart who resides in Escambia County, Florida. She is a registered nurse. She applied for a religious exemption to the COVID-19 Vaccine Mandate based on her sincerely held Christian religious beliefs, including her objection to the use of fetal cell lines from elective abortions in the testing, development, or production of the available vaccinations for COVID-19. Sacred Heart denied her request for a religious exemption from the Vaccine Mandate, stating she has until November 12, 2021, to comply. She was subsequently instructed by her manager to send a resignation email, which she has not done because she wants to maintain her employment at Sacred Heart.



c) Plaintiff Lizanne Alvarez is an employee of St. Vincent's and resides in St. John's County, Florida. She is a registered nurse and has worked for St. Vincent's for nine years. She submitted an application for a religious exemption to the Vaccine Mandate based on her sincerely held religious beliefs, including her objection to benefitting from abortion. St. Vincent's denied her request for a religious exemption. She filed an appeal, which St. Vincent's also denied. She also submitted a request for a religious exemption to St. Vincent's influenza vaccination requirement, which St. Vincent's denied initially and then spontaneously granted.

d) Plaintiff Rose Dunn was an employee of St. Vincent's who resides in Baker County, Florida. She is a registered nurse, and worked for Ascension from 2003 until she was constructively terminated in October of 2021. She tested positive for COVID-19 in August of 2021, and has since recovered. She applied for a religious exemption from the Vaccine Mandate, which St. Vincent's denied, resulting in her forced resignation.



e) Plaintiff Lisa Baker is an employee of St. Vincent's and resides in Duval County, Florida. She has worked for St. Vincent's since 2013, and has been a lead MRI technologist there since 2018. She applied for a religious exemption to the Vaccine Mandate based on her sincerely held religious beliefs, including her opposition to benefitting from abortion. St. Vincent's denied Plaintiff Baker's request, noting that it would place an undue hardship on St. Vincent's to accommodate it.

f) Plaintiff Marcus Hollers is an employee of St. Vincent's who resides in Clay County, Florida. He is a registered nurse. Plaintiff Hollers objects to being vaccinated for COVID-19 based on his sincerely held religious beliefs, including his belief that his body is a temple of the Holy Spirit and his objection to the use of aborted fetal cells in the research and development of the COVID-19 vaccines. St. Vincent's denied Plaintiff Hollers' request for a religious exemption from the Vaccine Mandate. In previous years, St. Vincent's granted Plaintiff Hollers a religious exemption from St. Vincent's annual influenza vaccination

requirement. However, St. Vincent's denied his request for a religious exemption to the COVID-19 Vaccine Mandate.

g) Plaintiff Jacey Sokeland is an employee of Sacred Heart who resides in Okaloosa County, Florida. He applied for a religious exemption to the Vaccine Mandate, which Sacred Heart denied, claiming that accommodating his request would pose an undue hardship.

h) Robert Major is an employee of Sacred Heart who resides in Santa Rosa County, Florida. He had COVID-19 in January of 2021, and has since recovered. He applied for a religious exemption to the Vaccine Mandate based on his sincerely held Christian religious beliefs, including, among other things, his opposition to abortion. Through prayer, he concluded that he must not receive any of the COVID-19 vaccinations.

25.     Plaintiffs do not participate in the Defendants' religious or pastoral mission or perform any different duties from employees of secular hospitals.

26.     The Plaintiffs will separately file their declarations supporting the relief requested herein.



27.    The Plaintiffs' expert declarations supporting the relief requested herein will be separately filed.

## The "Vaccinate or Terminate" Policy

28.    In late July, 2021, the Defendants announced, through a series of formal and informal communications that, in addition to an annual influenza vaccine, the Plaintiffs must receive two injections of the mRNA Covid drugs or one injection of Johnson & Johnson's formulation prior to November 12, 2021 (the "Mandatory Deadline"), and must take the influenza vaccine, or they will be constructively terminated either by being placed on unpaid leave or "deemed" to have resigned. Contractors of the hospital also face termination of their contracts or constructive termination of their contracts. Collectively, the policy will be referred to as the "Vaccine Mandate."

29.    The Defendants' stated purpose for the Vaccine Mandate is that "when everyone is vaccinated, everyone is safer:"[13]

> On July 27, Ascension announced a COVID-19 vaccination requirement for our associates. This decision is rooted in our Mission commitment to leading with quality and safety and is consistent with the approach Ascension has taken in requiring vaccines such as influenza. Our first priority is to provide a safe environment for our patients and our associates. By now, the facts are clear: everyone is safer when everyone is vaccinated.

---

[13] October 22, 2021 memorandum to associates.



30.    The Defendants have stated that they will accommodate religious and medical exceptions to the Vaccine Mandate.

31.    None of the Plaintiffs want to take the injections. None of the Plaintiffs believe that the injections are medically necessary in their individual medical situation.

32.    Many of the Plaintiffs were previously infected by the Covid virus while working for Defendants during the peak of the pandemic. These Plaintiffs now have durable and long-lasting natural immunity. The injections offer no benefit whatsoever to these Plaintiffs, but create unwanted risk of encountering adverse reactions to the vaccines, including potentially death.[14]

33.    The Defendants have repeatedly asserted, orally and in writing, that Plaintiffs who do not agree to be injected will be "deemed to have resigned." In other words, they will be constructively terminated. The Defendants said that employees who do not comply with the Vaccine Mandate will be placed on unpaid leave and removed from work schedules.

---

[14] See e.g., Washington Post, "Coronavirus vaccines work. But this statistical illusion makes people think they don't", available at https://www.washingtonpost.com/outlook/2021/08/31/covid-israel-hospitalization-rates-simpsons-paradox/ ("overall, more vaccinated Israelis were in the hospital than unvaccinated ones").



34.    On October 1, 2021, Ascension Florida and Gulf Coast sent an email to "Medical Staff Independent Physicians and Providers of Ascension Sacred Heart." The email described the "Process for Independent Providers to Document Compliance with COVID-19 Vaccination Requirement." In relevant part, it provides:

> **Independent providers who do not submit proof of full vaccination or are denied Medical or Religious Exemption will have hospital privileges administratively suspended starting November 12, 2021.**

Copy attached as **Exhibit 8**.

35.    The only vehicle Ascension Group provided for submitting a "religious accommodation request" is through a web portal. The portal contains a box that must be confirmed to continue processing the "request." The box says, among other things, that "I understand that should I fail to be vaccinated or granted an exemption on or before 5:00pm on November 12, 2021, I will be suspended … Continued failure to comply will be <u>deemed voluntary resignation</u>."  This is not voluntary resignation. This is merely constructive termination. There's nothing voluntary about it.

36.    Defendants' agents have also approached one or more of the Plaintiffs and demanded "letters of resignation" when those persons have



indicated they will not accept the injections. This includes Plaintiffs who did not "check the box" by submitting a request for a religious accommodation. They have been told by managers of Ascension Group that they are "voluntarily resigning" if they do not accept the injections. These Plaintiffs have refused to provide such a letter, because they do <u>not</u> agree to resign.

37.    Defendants' actual purpose for the Vaccine Mandate is to help the federal government achieve its goal of 95%+ vaccination of the entire U.S. population, to avoid penalties and sanctions, and to earn billions of dollars in incentives.

38.    The Vaccine Mandate does not include <u>any</u> consideration of persons having durable and long-lasting natural immunity.

### Prior Policies Regarding Other Vaccines

39.    Ascension Group has a policy requiring employees to take annual vaccines for influenza. Prior to 2021, employees could request and easily obtain a "permanent" opt-out for religious, moral, or medical reasons. These accommodations were readily granted by Ascension Group and many of the Plaintiffs were accommodated by them.



40.     In April, 2021, Ascension Group notified employees including the Plaintiffs that it was ending all permanent religious accommodations and employees would have to renew such requests in the fall.

41.     The   Ascension   Group   has   now   tied   requests   for accommodations for influenza to the requests for accommodations for the Covid vaccines, and a single request is made for both drugs.

42.     Ascension Group has been denying all, or nearly all, religious accommodation requests.

### Covid Levels Have Declined to Very Low Levels

43.     On October 22, 2021, Ascension Gulf Coast sent a memo to all staff celebrating low Covid-19 levels in its nine affiliated hospitals:





44.     The October 22, 2021 memo says that the number of Covid patients has been steadily falling from a peak of 500 at the beginning of September, to 97 the previous week, and only 68 patients as of the date of the memo — in nine hospitals, combined.

45.     The very low numbers of Covid patients in Florida do not support any legitimate business purpose justifying the Vaccine Mandate and its direct and indirect costs.

### The Vaccines / The Policy Does Not Further a Compelling Interest

46.     All three vaccines available in the U.S, Pfizer, Moderna, and Johnson & Johnson (the "Vaccines"), share similar characteristics with each other.

47.     The Vaccines are non-sterilizing; in other words, a vaccinated person can still become infected and transmit the virus to others.[15] *See* Declaration of James R. Neuenschwander, M.D., filed contemporaneously

---

[15] The CDC's website states: "… preliminary evidence suggests that fully vaccinated people who do become infected with the Delta variant can spread the virus to others." https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html.    "[W]hat [the vaccines] can't do anymore is prevent transmission."    CDC    Director    Rochelle    Walensky,    August    6,    2021, https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.



herewith ("Dr. Neu Declaration") ("once infected, the vaccine does not appear to do anything to prevent or stop transmission").

48.     The Vaccines do not provide any lasting immunity to the Covid-19 virus. Recent studies suggest the Vaccines' immunity begins to wane as soon as five weeks after the second injection. *Id.*

49.     At best, the Vaccines provide some additional protection against serious hospitalization and death from a Covid-19 infection.

50.     Under traditional definitions, the Vaccines are not "vaccines," but rather are more accurately described as therapeutics, since they do not prevent infections but rather may only ameliorate the severity of the disease.

51.     The most recent studies suggest that injected persons have the same or greater viral load in their upper respiratory systems.

52.     In other words, persons who have received the Covid injections and are subsequently exposed to an infection are equally if not more contagious than persons who have not received the Covid injections. Some recent studies have suggested that vaccinated persons may even spread the virus more easily, either because they have high levels of virus in their upper respiratory area, or because they are more likely to be asymptomatic and therefore less likely to know they are sick and take precautions.



53.     For this reason, being injected does not "protect others" or keep other persons "safe." *See* Dr. Neu Declaration.

54.     The Defendants do not require <u>patients</u> to be vaccinated prior to admission to their facilities.

55.     Therefore, even if vaccination did prevent transmission — which it does not — infected patients can transmit the virus to staff.

56.     Therefore, Defendants' claim that the Plaintiffs must be injected to protect other staff and patients is a pretext.

57.     The Covid-19 vaccines have generated more adverse event reports in the Vaccine Adverse Event Reporting System (VAERS) than all other vaccines combined.[16] Even this remarkable figure is most likely understated, quite possibly by a significant amount.

## The Policy is Not the Least Restrictive Means

58.     There are less restrictive means available to achieve the legitimate purposes allegedly ascribed to vaccination.

---

[16] See Declaration of Dr. Neu, ¶ IV ("This appears to be the most dangerous set of vaccines ever created based on these [VAERS] numbers").



59.     Alternative treatments including Remdesivir, steroids, Vitamin D, ivermectin and monoclonal antibody treatments have been shown to prevent infections and reduce severity and mortality from Covid infection.

60.     Masks have been used and continue to be used to prevent viral spread. Johns Hopkins' website says "If you are infected with the coronavirus and do not know it, a mask is <u>very good</u> at keeping your respiratory droplets and particles from infecting others."[17]

### Coercion from the Federal Administration (State Actor)

61.     The Biden Administration has announced an aggressive policy aimed at achieving very high rates of vaccination.

62.     But the federal government cannot directly mandate vaccines; this would be an unconstitutional invasion of the right to privacy and bodily autonomy.[18]

---

[17]   https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-face-masks-what-you-need-to-know.

[18] "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment[.]" *Cruzan by Cruzan v. Dir., Missouri Dept. of Health*, 497 U.S. 261, 278 (1990). "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990). *See also Washington v. Glucksberg*, 521 U.S. 702, 725 (1997) ("Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment, our assumption was entirely consistent with this Nation's history and constitutional traditions.").



63.     The Biden Administration is coercing private employers like the Ascension Group to implement "vaccinate or terminate" policies, by, *inter alia*:

a)  threatening them with a fine of up to $700,000 per employee,[19]

b)  threatening to cut off Medicare reimbursements to hospitals;[20]

c)  issuing an executive order applying to broadly-defined "federal contractors,"[21] and

d)  directing OSHA to formulate an emergency rule providing for penalties and fines on employers who have not complied.[22]

---

[19] *See* Adam Andrzejewski, *Biden's Vax Mandate to be Enforced by Fining Companies $70,000 to $700,000?*, Forbes (Sept. 28, 2021, 1:21 PM), https://www.forbes.com/sites/adamandrzejewski/2021/09/28/bidens-vax-mandate-to-be-enforced-by-fining-companies-70000-to-700000/?sh=3be663791c0d (reporting that Biden intends to enforce Covid-19 vaccine mandate on companies employing 100 or more people, and noting an enforcement mechanism added to the House of Representatives' $3.5 trillion reconciliation bill, which would amend 29 U.S.C. § 666 to impose up to $700,000 in fines "for willful or repeated violations" of OSHA rules likely to be used to enforce the vaccine mandate).

[20] *See Biden-Harris Administration to Expand Vaccination Requirements for Health Care Settings*, Centers for Medicare & Medicaid Services, (Sept. 9, 2021), https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand-vaccination-requirements-health-care-settings ("The Centers for Medicare & Medicaid Services (CMS), in collaboration with the Centers for Disease Control and Prevention (CDC), announced today that emergency regulations requiring vaccinations for nursing home workers will be expanded to include hospitals, dialysis facilities, ambulatory surgical settings, and home health agencies, among others, as a condition for participating in the Medicare and Medicaid programs.")

[21] *See* Proclamation No. 14042, 86 Fed. Reg. 50,985 (Sept. 9, 2021).

[22] *See White House Announces Vaccination Mandate or Weekly Testing for Large Employers, and Vaccination Mandate for Federal Employees and Contractors*, National Law Review, Volume XI, Number 253 (Sept. 10, 2021), *available at:* https://www.natlawreview.com/article/white-house-announces-vaccination-mandate-or-weekly-testing-large-employers-and (noting that OSHA "is developing an emergency temporary standard" requiring that large employers impose vaccine mandate and that "OSHA will have the ability to fine non-compliant businesses up to $14,000 per violation").



64.   Upon information and belief, federal officials have communicated with Ascension Group officials to pressure them directly to implement these "private" mandates.

65.   President Joe Biden began lobbying private companies like the Ascension Group in July – just before the Vaccine Mandate was announced:

> The President announced vaccination requirements for the federal government in July and called on the private sector to do more to encourage vaccination as well. Since that time, employers, schools, nursing homes, restaurants, hospitals, and cities in all 50 states have announced new vaccination requirements. Since July, the share of job postings that require vaccination are up 90%. And we know these requirements work.

The White House, "Path out of the Pandemic: President Biden's Covid-19 Action Plan," *available at:* https://www.whitehouse.gov/covidplan/.

66.   The Defendants' Vaccine Mandate is part of a coordinated group of large companies all across the United States requiring vaccines from employees even though they stand to lose substantial amounts of money from the direct and indirect consequences.[23]

---

[23] See, e.g., Southwest Airline's vaccine mandate, even though CEO Gary Kelly said he has "never been in favor of corporations imposing that kind of a mandate. I'm not in favor of that, never have been." *Available at* https://www.cnbc.com/2021/10/12/covid-vaccine-southwest-ceo-gary-kelly-says-he-never-wanted-a-mandate.html.



67.     Ascension's <u>Management's Discussion and Analysis of Financial</u> <u>Condition and Results of Operations for Ascension</u> for the year ending July 2021 disclosed that the Ascension "System received $1.8 billion of distributions from the Provider Relief Fund[, established under the CARES Act,] during both the fiscal years ended June 30, 2021 and 2020." Copy attached as **Exhibit 3**.

68.     Page 20 of Ascension's Consolidated Financial Statements (Q4) for Fiscal Year 2021 discloses that "Payments from the Provider Relief Fund are to be used to prevent, prepare for, and respond to coronavirus, and shall reimburse the recipient for health care related expenses and lost revenues attributable to coronavirus." Copy attached as **Exhibit 4**.

69.     On September 9, 2021, CMS published a press release on its website, recapitulating various public statements from the Biden Administration over the previous weeks:[24]

> The Biden-Harris Administration will require COVID-19 vaccination of staff within all Medicare and Medicaid-certified facilities to protect both them and patients from the virus and its more contagious Delta variant.  Facilities across the country should make efforts now to get health care staff

---

[24] *Available at* https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand-vaccination-requirements-health-care-settings.



vaccinated to make sure they are in compliance when the rule takes effect.

70.     The Medicare/CMS penalties attached to Defendants' potential failure to meet federal government targets for vaccination would make Defendants financially non-viable.

### Public Function (State Actor)

71.     The Ascension Group's Vaccine Mandate implements and furthers the traditional state goal of public health management.

72.     Mandatory vaccination in Florida is reserved to the State Health Officer. *See, e.g*, Florida Statutes § 381.00315.

73.     The Vaccine Mandate is a mandatory vaccination policy aimed at broad public health objectives that have traditionally been the province of government. Implementing and enforcing a vaccination mandate in response to a pandemic is traditionally a public function. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020), 141 S. Ct. 10, 12, 208 L.Ed.2d 155, 156 (2020) ("Our Constitution principally entrusts the safety and the health of the people <u>to the politically accountable officials of the States</u> to guard and protect.") (quotes omitted), *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 25 S. Ct. 358, 362 (1905) ("[I]t is equally true that in every well-



ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, <u>as the safety of the general public may demand</u>," emphasis added).

74.   The Vaccine Mandate constitutes performance of a public function with the government's acquiescence. *See, e.g., Marsh v. Alabama*, 326 U.S. 501, 507, 66 S. Ct. 276, 279 (1946) ("And even had there been no express franchise but mere acquiescence by the State in the corporation's use of its property as a segment of the four-lane highway, operation of all the highway, including the segment owned by the corporation, would still have been performance of a public function and discrimination would certainly have been illegal.").

75.   The Vaccines are the property of the federal government, and remain the property of the federal government until they are injected into citizens:

> At this time, all COVID-19 vaccine in the United States has been purchased by the United States Government for administration exclusively by enrolled providers through the CDC COVID-19 Vaccination Program. Vaccine remains U.S.



government property until administered to the vaccination recipient.

*CDC      Website*      (https://www.cdc.gov/vaccines/covid-19/provider-enrollment.html).

76.     Therefore, the Vaccine Mandate is intended to assist the federal government with delivering <u>its property</u> into the bodies of citizens, including the Plaintiffs.

77.     The Defendants' broad, undifferentiated, non-individualized vaccination policy does not reduce the spread of the virus in the hospitals, or prevent patient or staff infections, but serves only to help further the government's stated goal of reaching certain population rates of vaccination.

78.     Ascension Group operated throughout 2020 and most of 2021 without a Vaccine Mandate, during which time many if not most of its staff were exposed to the Covid virus.

79.     Survival rates of confirmed COVID infected patients who survive between ages 20-50 is 99.98%, and between ages 50-70 is 99.5%. The Plaintiffs are all aged between 20 and 70. Many of them have acquired natural immunities, and their chances of survival are much higher than these figures. In other words, there is no statistical benefit to the Ascension Group



in terms of reduced mortality over baseline levels arising from the Vaccine Mandate.

80.    Therefore, there is no legitimate business purpose furthered by the policy.

81.    The federal government has tied various financial incentives and payments to the Ascension Group's compliance with its vaccination objectives.

82.    On October 15, 2021, Plaintiffs sent Defendants a letter demanding their compliance with applicable law and providing a deadline of October 19, 2021 to respond. Defendants did not respond to the demand letter by that deadline (or afterward).

83.    Although counsel for the Plaintiffs have significantly limited Plaintiffs' liability for fees, the Plaintiffs have incurred attorney's fees and costs in bringing this action.

## COUNT I – DECLARATORY — STATE ACTOR

84.    Paragraphs 1-83 are incorporated herein.

85.    There are three tests for determining when a private party is acting under color of state law. The Public Function Test, State Compulsion



Test, and the Nexus/Joint Action Test. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1276-77 (11th Cir. 2003).

86. Defendants are subject to constitutional limitations when they act as a state actor. *See Willis v. Univ. Health Services, Inc.*, 993 F.2d 837, 840 (11th Cir. 1993) ("A private hospital is subject to the provisions of 42 U.S.C. § 1983 and the Fourteenth Amendment only if its activities are significantly affected with state involvement," internal cites, quotes, brackets omitted).

87. "The public function test limits state action to instances where private actors are performing functions traditionally the exclusive prerogative of the state." *Id.* (internal quotes omitted).

88. "The state compulsion test limits state action to instances where the government has <u>coerced</u> or at least <u>significantly encouraged</u> the action alleged to violate the Constitution." *Id*. (internal quotes omitted, emphasis added).

89. Ascension Group is a state actor under both the Public Function Test and the State Compulsion Test, since it is undertaking public health functions traditionally the exclusive prerogative of the state, and has been coerced and significantly encouraged by the federal government to violation the Plaintiffs' Constitutional rights.



90.    It is manifestly obvious that, but for the encouragement and coercion of the federal government, the Defendants would not undertake such a destructive and irrational policy as terminating healthcare workers in the midst of a pandemic but for the federal government's myriad policies designed to coerce Defendants into adopting the Vaccine Mandate.

91.    In other words, the federal government has entered into the Defendants' decision-making process, such that the Defendants' choices may be deemed those of the federal government.

92.    There is a bona-fide, actual and present need for a declaration over the relative rights and duties between the Plaintiffs and the Defendants, and this declaration is not propounded from mere curiosity or to obtain legal advice.

93.    Pursuant to Fed. R. Civ. P. 57, the Court may order a speedy hearing of this declaratory action.

94.    This Court should declare that the Defendants are state actors relative to the Vaccine Mandate, and that Defendants are entitled to statutory and constitutional protections that apply to government actors.



95.    Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Ascension Group from enforcing the Vaccine Mandate.

## COUNT II – VIOLATION OF RIGHT TO PRIVACY

96.    Paragraphs 1-91 are incorporated herein.

97.    Since the Defendants are state actors, they are subject to constitutional limitations and scrutiny.

98.    The Vaccine Mandate violates Plaintiffs' right to privacy guaranteed by Art. I, § 23 of the Florida Constitution.

99.    The United States Supreme Court has directed lower courts to test a compelled vaccination law against the constitution of the individual state. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 26 (1905).

100.   Florida law provides that compelling an unwanted "medical treatment" violates Florida's fundamental right to privacy — Article I, § 23 of the Florida constitution — and citizens' right to refuse unwanted medical treatments. *Green v. Alachua County,* --- So.3d ---, 2021 WL 2387983 (Fla. 1st DCA 2021); *Machovec v. Palm Beach Cnty.*, 310 So. 3d 941 (Fla. 4th DCA 2021). "[A]ny compelled intrusion into the human body implicates significant,



constitutionally protected privacy interests." *Missouri v. McNeely*, 569 U.S. 141, 143 (2013).

101.   "If a challenged law *implicates* Florida's right to privacy, the burden shifts to the government to prove that the law furthers a compelling state interest in the least restrictive way"—also known as the "strict scrutiny" standard. *Green*, 2021 WL at *6 (*citing Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1260 (Fla. 2017)).

102.   This "strict scrutiny" standard applies equally when the government enforces laws, and for government action when it enforces workplace policies as an employer. *See City of N. Miami v. Kurtz*, 653 So. 2d 1025, 1028 (Fla. 1995).

103.   There can be no doubt that the Vaccine Mandate is a medical treatment which, when unwanted, violates Plaintiffs' right to refuse medical treatment. *See Green*, 2021 WL at * 7 ("the supreme court has construed this fundamental right to be so broad as to include the complete freedom of a person to control his own body."). It invades Plaintiffs' privacy. By their nature, vaccines extend far beyond the workplace into "a person's private or home life," "alter one's physical person," and permanently modify a



citizen's corporeal being — the opposite of a "temporary and *de minimus* interference[.]" *Id.* at *33 (Lewis, J. dissenting).

104.   The Defendants' Vaccine Mandate facially interferes with its employees' right to refuse unwanted medical treatments, implicates Plaintiffs' fundamental right to privacy, and is "presumptively unconstitutional." *Green*, 2021 WL at *5, 10.

105.   Under Florida law, if a challenged policy implicates a privacy right, the burden shifts to the state actor "to prove that the law further[s] a compelling state interest in the least restrictive way." *Gainesville Woman Care*, 210 So. 3d at 1260. When the state actor fails to offer evidence to demonstrate a compelling state interest, the trial court then is absolved of having to make any finding to that effect. *See id.* at 1260–61.

106.   The Vaccine Mandate also violates Plaintiffs' fundamental right to privacy guaranteed by the federal Constitution and secured by the Fourteenth Amendment. "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment[.]" *Cruzan by Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261, 278 (1990).  "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494



U.S. 210, 229 (1990). *See also Washington v. Glucksberg*, 521 U.S. 702, 725 (1997) ("Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment, our assumption was entirely consistent with this Nation's history and constitutional traditions.").

107.   The threat of termination of employment is, by nature, coercive. *See, e.g., Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Rick Scott*, 717 F.3d 851, 874 (11th Cir. 2013) ("In effect, the State is offering its employees this Hobson's choice: either they relinquish their Fourth Amendment rights and produce a urine sample which carries the potential for termination, or they accept termination immediately … To begin with, we do not agree that employees' submission to drug testing, on pain of termination, constitutes consent under governing Supreme Court case law"). "Employees who must submit to a drug test or be fired are hardly acting voluntarily, free of either express or implied duress and coercion." *Id*.

108.   The Plaintiffs, who must all submit to vaccination "or be fired[,] are hardly acting voluntarily, free of either express or implied duress and coercion." *Id*.



109.   In *Green v. Alachua Cty.*, 2021 WL 2387983 (Fla. 1st DCA 2021), Florida's First DCA found that mask mandates are presumptively unconstitutional because they violate citizens' constitutional right to privacy.  "The right of privacy is a fundamental one, expressly protected by the Florida Constitution, and any law that implicates it is presumptively unconstitutional, such that it must be subject to strict scrutiny and justified as the least restrictive means to serve a compelling governmental interest." *Id.*

110.   There is a bona-fide, actual and present need for a declaration over the relative rights and duties between the Plaintiffs and the Defendants, and this declaration is not propounded from mere curiosity or to obtain legal advice.

111.   Pursuant to Fed. R. Civ. P. 57, the Court may order a speedy hearing of this declaratory action.

112.   This Court should declare that the Vaccine Mandate is presumptively unconstitutional under Florida's Right to Privacy, Art. I, § 23, Fla. Const., and under the 14th Amendment of the Constitution; and therefore the Defendants must prove that the Vaccine Mandate furthers a compelling state interest using the least restrictive means.



## COUNT III – TITLE VII

113.   Paragraphs 1-45 and Paragraph 83 are incorporated herein.

114.   Pursuing administrative remedies with the EEOC under Title VII or the Florida Commission on Human Relations under Florida's Civil Rights Act of 1992 would be futile, because neither statute provides discriminated employees with access to emergency injunctive relief.[25]

115.   In 2017, the Attorney General of the United States published a memorandum titled Federal Law Protections for Religious Liberty. The AG's memo begins by reciting the primary significance of religious liberty in the United States:[26]

> Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of federal law. As James Madison explained in his Memorial and Remonstrance Against Religious Assessments, the free exercise of religion "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society." Religious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place. It also encompasses religious observance and practice. Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith

---

[25] Injunctive relief is not one of the available forms of relief under the Florida Civil Rights Act's administrative remedies. And, Title VII only provides for injunctive relief in the context of a settlement agreement between the EEOC and an employer.

[26] Federal Law Protections for Religious Liberty, 82 Fed. Reg. 49668-01, 49668 (Oct. 26, 2017).



and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming.

… In the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences. It is a fundamental right.

116.   Title VII of the Civil Rights Act prohibits Defendants from discriminating against Plaintiffs because of their sincerely held religious beliefs. 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . religion . . . .").

117.   Defendants have a duty under Title VII to provide religious exemptions and accommodations to those with sincerely held religious objections to the Vaccine Mandate.

118.   By broadly denying Plaintiffs' requests for religious accommodation, Defendants are violating federal law's requirement that sincerely held religious belief be protected and accommodated. *Id.*



119.   Similarly, Florida law guarantees employees in corporations with more than 15 employees similar protections for their religious liberties. *See* Florida Statutes §§ 760.01-760.11 and 509.092 (the "Florida Civil Rights Act").

120.   Unlike Title VII, the Florida Civil Rights Act does not include a broad exclusion for religiously-based organizations as such, but only those organizations which condition employment on a particular faith tradition:

> This section shall not apply to any religious corporation, association, educational institution, or society which **conditions** opportunities in the area of employment or public accommodation to members of that religious corporation, association, educational institution, or society or to persons who subscribe to its tenets or beliefs.

§ 760.10, Fla. Stat. Ann. (emphasis added).

121.   There is a bona-fide, actual and present need for a declaration over the relative rights and duties between the Plaintiffs and the Defendants, and this declaration is not propounded from mere curiosity or to obtain legal advice.

122.   Pursuant to Fed. R. Civ. P. 57, the Court may order a speedy hearing of this declaratory action.



123.   Pursuant to Title VII and Florida's Civil Rights Act of 1992, this Court should declare that the Defendants have engaged in unlawful religious discrimination.

124.   Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Ascension Group from enforcing the Vaccine Mandate.

## Prayer for Relief

WHEREFORE, Plaintiffs pray for judgment in their favor and against the Defendants as follows:

## COUNT I

A declaration that the Defendants are state actors relative to the Vaccine Mandate, and that Defendants are entitled to statutory and constitutional protections that apply to government actors.

## COUNT II

A declaration that the Vaccine Mandate is presumptively unconstitutional under Florida's Right to Privacy, Art. I, § 23, Fla. Const., and/or under the 14th Amendment of the Constitution; and therefore the Defendants must prove that the Vaccine Mandate furthers a compelling state interest using the least restrictive means.



## COUNT III

A declaration under 42 U.S.C. § 1983 that the Plaintiffs are violating Title VII by discriminating against the Plaintiffs' religious beliefs.

## ALL COUNTS

Provide temporary, preliminary and permanent injunctive relief, award Plaintiffs their damages, attorney's fees and costs, and, order all such further relief as the Court deems necessary and just.

Respectfully submitted,

Dated this 28th day of October, 2021.



CHILDERS LAW, LLC

2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel 866-996-6104  fax 407-209-3870
email jchilders@smartbizlaw.com

  /s/ Seldon J. Childers, Esq.    .
Florida Bar No. 61112
*Attorneys for Plaintiffs*



BOATMAN RICCI

<u>/s/James A. Boatman, Jr., Esq.</u>
James A. Boatman, Jr., Esq.
Fla. Bar No. 130184
3021 Airport-Pulling Rd. N.,
Suite 202
Naples, Florida 34105
Email: CourtFilings@boatmanricci.com
(239) 330-1494 – Telephone
*Attorneys for Plaintiffs*

## **<u>VERIFICATION</u>**

I, CARLEIGH HARRISON, am over the age of eighteen years and a Plaintiff in this action. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

Dated:
October 27, 2021

<u>/s/ Carleigh Harrison</u>
CARLEIGH HARRISON

(*Original Signature retained by Counsel*)