# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

CATHERINE DARLING, *et al*,

       Plaintiffs,

v.

SACRED HEART HEALTH SYSTEM,
INC., a Florida nonprofit corporation, ST.
VINCENT'S HEALTH SYSTEM, INC., a
Florida nonprofit corporation, ST.
VINCENT'S MEDICAL CENTER-CLAY
COUNTY, INC., a Florida nonprofit
corporation, ST. VINCENT'S
AMBULATORY CARE, INC., a Florida
nonprofit corporation, ST. VINCENT'S
MEDICAL CENTER, INC.,  a Florida
nonprofit corporation, ST. LUKE'S-ST.
VINCENT'S HEALTHCARE, INC., a
Florida nonprofit corporation, and
ASCENSION HEALTH ALLIANCE, a
Missouri non-profit corporation,

       Defendants.

_____/

Case No. 3:21-cv-1787

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION



# **TABLE OF CONTENTS**

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ..................................1

ORDER AND A PRELIMINARY INJUNCTION ..................................1

**TABLE OF CONTENTS** ..................................2

**TABLE OF AUTHORITIES** ..................................3

**INTRODUCTION** ..................................7

**URGENCY OF THIS ACTION REQUIRES EMERGENCY RELIEF** ..........10

**ARGUMENT** ..................................10

A. Summary of Argument ..................................10

B. The Defendants Are State Actors Under the Public Function Test ...................13

C. The Defendants Are State Actors Under the State Compulsion Test ................17

D. This Court Must look to Florida Law When Evaluating the Vaccine Mandate .23

E. The Vaccine Mandate Violates the Plaintiffs' Constitutional Right to Privacy .23

F. Defendants Have the Burden of Proving the Vaccine Mandate Meets Strict Scrutiny ..................................25

G. Title VII and Florida Civil Rights Act Claims Apply to the Defendants ..........27

H. Defendants Have Discriminated Against Plaintiffs ..................................29

I.   Plaintiffs Meet the Elements Necessary for Preliminary Injunctive Relief.....31

1. Irreparable Harm ..................................32

2. Likelihood of Prevailing on the Merits ..................................34

3. Balancing of Harms ..................................36

4. Public Interest ..................................36

5. Bond Requirement ..................................37

6. Request for Hearing ..................................37

**CONCLUSION** ..................................37

**CERTIFICATE OF SERVICE** ..................................40



# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Rick Scott*,
717 F.3d 851 (11th Cir. 2013) ............................................................26

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ...........................................................................35

*Baker v. Buckeye Cellulose Corp.*,
856 F.2d 167 (11th Cir. 1988) ...........................................................32

*Bernal v. Fainter*,
467 U.S. 216 (1984) ...........................................................................26

*Branti v. Finkle*,
445 U.S. 507 (1980) ...........................................................................33

*Bright v. Pittsburgh Musical Soc'y*,
379 Pa. 335 (1954) .............................................................................33

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
827 F.2d 1291(9th Cir. 1987) .............................................................22

*Cate v. Oldham*,
707 F.2d 1176 (11th Cir. 1983) .................................................... 32, 33

*City of N. Miami v. Kurtz*,
653 So. 2d 1025 (Fla. 1995) ...............................................................24

*Cohen v. World Omni Fin. Corp.*,
457 Fed. Appx. 822 (11th Cir. 2012) .................................................23

*Cruzan by Cruzan v. Dir., Mo. Dept. of Health*,
497 U.S. 261 (1990) ...........................................................................25

*Cunningham v. Adams*,
808 F.2d 815 (11th Cir. 1987) ...........................................................32

*Fields v. Palmdale Sch. Dist.*,
427 F.3d 1197 (9th Cir. 2005) ...........................................................26

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
344 F.3d 1263 (11th Cir. 2003) ..........................................................12

*Gainesville Woman Care, LLC v. State*,
210 So. 3d 1243 (Fla. 2017) ....................................................... passim



*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*,
  415 U.S. 423 (1974) ..........................................................................................38

*Green v. Alachua Cty.*,
  --- So.3d ---, 2021 WL 2387983 (Fla. 1st DCA 2021) .................... 24, 25, 27, 33

*Hammerhead Enters., Inc. v. Brezenoff*,
  707 F.2d 33(2d Cir. 1983) ..................................................................................22

*Hitt v. N. Broward Hosp. Dist.*,
  387 So. 2d 482 (Fla. 4th DCA 1980) ..................................................................33

*Jacobson v. Massachusetts*,
  197 U.S. 11, 29 (1905) ............................................................................... 14, 23

*Langston ex rel. Langston v. ACT*,
  890 F.2d 380 (11th Cir. 1989)..............................................................................23

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011)................................................................................36

*Machovec v. Palm Beach Cty.*,
  310 So. 3d 941 (Fla. 4th DCA 2021) ..................................................................24

*Marsh v. Alabama*,
  326 U.S. 501 (1946) ............................................................................................15

*Missouri v. McNeely*,
  569 U.S. 141 (2013) ............................................................................................24

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013)................................................................................37

*Rayburn v. Gen. Conference of Seventh-Day Adventists*,
  772 F.2d 1164 (4th Cir. 1985)..............................................................................28

*Robins v. Pruneyard Shopping Ctr.*,
  23 Cal.3d 899 (1979)............................................................................................33

*Ross v. Metro. Church of God*,
  471 F. Supp. 2d 1306 (N.D. Ga. 2007) ..............................................................28

*S. Bay United Pentecostal Church v. Newsom*,
  140 S. Ct. 1613 (2020) ........................................................................................14

*Skinner v. Ry. Lab. Execs.' Ass'n*,
  489 U.S. 602 (1989) ..................................................................................... 21, 22



*Skrzypczak v. Roman Catholic Diocese of Tulsa*,
   611 F.3d 1238 (10th Cir. 2010)........................................................28

*Thomas v. Review Bd. of Ind. Emp't. Sec. Div.*,
   450 U.S. 707 (1981) ......................................................................35

*Thompson v. Planning Comm'n of Jacksonville*,
   464 So.2d 1231 (Fla. 1st DCA 1985)..............................................34

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ......................................................................33

*Tucker v. Resha*,
   634 So.2d 756 (Fla. 1st DCA 1994)................................................34

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ......................................................................25

*Washington v. Harper*,
   494 U.S. 210 (1990) .................................................................25, 26

*Willis v. Univ. Health Servs., Inc.*,
   993 F.2d 837 (11th Cir. 1993) ..................................................12, 13

## Statutes

42 U.S.C. § 1983 ................................................................................15

42 U.S.C. § 2000e-2 ......................................................................33, 34

*Fla. Stat.* § 768.38 .......................................................................19, 37

*Fla. Stat.* §§ 760.01-760.11 ...............................................................34

*Fla. Stat.* §509.092.............................................................................34

*Fla. Stat. Ann.* § 760.10 ....................................................................31

## Florida Rules of Civil Procedure

Fla. R. Civ. Pro. 65.............................................................................31

## Regulations

Federal Law Protections for Religious Liberty,
   82 Fed. Reg. 49668-018 (Oct. 26, 2017)........................................30

## Other Authorities

14 C.J.S. Civil Rights Supp. § 94 .......................................................33

17 Fla.Jur. Injunctions § 30................................................................33

43A C.J.S. Injunctions § 149 .............................................................33



*CDC Website*, available at https://www.cdc.gov/vaccines/covid-19/provider-enrollment.html ..................................................................................................14

Center for American Progress, "Mandatory COVID-19 Vaccination for Health Care Workers as a Condition for Medicare and Medicaid Participation," *available at*: https://www.americanprogress.org/issues/healthcare/news/2021/08/06/502409/mandatory-covid-19-vaccination-health-care-workers-condition-medicare-medicaid-participation/.......................................................................................19

Health Reform, "How Are Hospitals Faring Under the Affordable Care Act? Early Experiences from Ascension Health," *available at:* https://www.kff.org/health-reform/issue-brief/how-are-hospitals-faring-under-the-affordable-care-act-early-experiences-from-ascension-health/view/print/ ...................................................19

KHN, "Checking In With Ascension Health, Largest Catholic Health System", *available at* https://khn.org/checking-in-with-ascension/...................................19

Southwest  Airline's vaccine mandate, even though CEO Gary Kelly said he has "never been in favor of corporations imposing that kind of a mandate. I'm not in favor of that, never have been."  *Available at* https://www.cnbc.com/2021/10/12/covid-vaccine-southwest-ceo-gary-kelly-says-he-never-wanted-a-mandate.html..................................................................23

The White House, "Requiring Covid-19 Vaccinations for Over 17 Million Health Care Workers," https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand-vaccination-requirements-health-care-settings ...............18

The White House, "Path out of the Pandemic: President Biden's Covid-19 Action Plan," /available at:/ https://www.whitehouse.gov/covidplan/ ............... 13, 17, 18

USA Today, "President Biden says nursing homes must vaccinate workers against COVID-19," *available at:* https://www.usatoday.com/story/news/politics/2021/08/18/biden-announce-nursing-homes-must-vaccinate-workers-against-covid-19/8183943002/............19



# INTRODUCTION

> And what rough beast, its hour come round at last,
> Slouches towards Bethlehem to be born?
>
> — *William Butler Yeats, "The Second Coming"*

The Biden Administration began its aggressive campaign to vaccinate every American in July, focusing on private employers as a key part of its national strategy. By July 28, 2021, Ascension — the second-largest hospital chain in the country, with half or more of its revenue controlled by the federal government, and now addicted to billions of dollars in CARES Act pandemic funding — fell into line, and ordered its employees to be vaccinated for Covid or seek employment elsewhere. It also cancelled all existing vaccine-related religious exemptions — longstanding exemptions that it had been routinely granting for years. It told employees to re-apply in the fall for those previously-approved, longstanding exemptions.

When the employees re-applied in the Fall, they were provided with a brand-new website for exemption requests, combining the previous process for obtaining flu vaccine exemptions with the new Covid vaccine requirement. The new "exemptions portal" had a novel feature: a box that employees <u>had</u> to check in order to submit their exemption request. The box said the employees agreed that, if their requests were denied, then they would "voluntarily resign." Check the box to proceed.

Ascension then summarily denied all or nearly all employee exemptions.[1]

Unsatisfied with employee mandates, Ascension followed the federal government's lead and also required all contractors and providers to mandate vaccination, or else their contracts would be terminated, creating a daisy-chain of coerced, unwanted medical treatments forced on ordinary, law-abiding Americans under threat of severe economic dislocation.

Ascension's timing is not terrific. Florida now has the lowest Covid-19 infection rate in the United States. The survival rates for Covid-19 infected patients between the ages of 20 and 50 —like the majority of the Plaintiffs— is over 99.98%. Even between ages 50 to 70 it exceeds 99.5%. These statistics include infected people at high risk for Covid mortality. The Plaintiffs — all frontline healthcare workers — are much healthier overall than the general population. Many of them have already acquired natural immunities to the disease from on-the-job exposure. The Plaintiffs' chances of survival are much higher even than the stock figures.

In other words, Ascension's Vaccine Mandate offers no statistical benefit to its hospitals in terms of reducing mortality over baseline levels. The vaccines do not prevent transmission. There is no rational basis for Ascension's coercive policy

---

[1] Since receiving the Plaintiffs' demand letter a couple weeks ago, Ascension has started "re-considering" exemptions and approving a few here and there, in a transparent attempt to defend its indefensible conduct.

except that it is being compelled to do so by the federal government, and it has agreed to help the federal government effectuate a broad national public health objective.

Like the employees whose livelihood is being threatened by Ascension, Ascension's livelihood is being threatened by the federal government.

Because the federal government cannot directly mandate vaccines — that would be an unconstitutional invasion of the right to privacy and bodily autonomy —it has created a web of related and unrelated federal threats, bribes, incentives and sanctions designed to coerce private actors like Ascension to do what it cannot: require citizens to accept unwanted medical treatments.

The Ascension Group's Vaccine Mandate does not further the hospitals' mission of treating individual patients. Instead, it implements and furthers the traditional government job of broad public health management by effectuating delivery of federal property (the vaccines) into the bodies of private citizens. The Defendants are not acting voluntarily, but rather have been massively incentivized and coerced into implementing the government's policy through its Vaccine Mandate — trampling Plaintiffs' state and federal statutory and constitutional religious liberties and privacy rights.

The Plaintiffs' *Verified Complaint for Declaratory Relief* is incorporated as though fully set forth herein.

## <u>URGENCY OF THIS ACTION REQUIRES EMERGENCY RELIEF</u>

The Defendants have notified Plaintiffs that they will be constructively terminated if they do not accept unwanted medical treatments prior to November 12, 2021. While Defendants initially told the Plaintiffs that they would honor medical religious accommodations as an exception to the vaccine requirement policy, it became clear only recently that the exemption process was only a ruse. In fact, the Defendants are <u>not</u> reasonably honoring requests for accommodation as they have in the past. Therefore, to preserve the status quo — with no harm or prejudice *whatsoever* to Defendants — emergency relief is immediately required. The Plaintiffs request that the Court enter an immediate Temporary Restraining Order ("TRO") to preserve the status quo, and set a hearing on their request for a preliminary injunction allowing sufficient time to fully brief the case and obtain necessary evidence.

## <u>ARGUMENT</u>

### A. Summary of Argument

It is obvious to the point of being common knowledge that private actors like the Defendants would not be acting in concert all across the country to implement vaccine mandates but for the encouragement and coercion of the federal government. In an October 21, 2021 press conference, Governor DeSantis uncontroversially referred to the federal government's procurement of private employer mandates:



> We need to take action to protect Florida jobs. We have a situation now, unfortunately, in our country where we have a federal government that is very much trying to use the heavy hand of federal government to force these injections.

Governor DeSantis specifically referred to coercion of private healthcare providers like the Defendants by the federal government's threatening their Medicare/Medicaid payments:

> And then the medical CMS — where they're threatening the Medicaid and Medicare funding — we're going to exhaust every legal avenue that we have there.

While there were a variety of responses in the media to the Governor's press conference, no one challenged his description of the federal origins of the private employer vaccine mandates. Why would they? There is no other reasonable explanation for the collective, concerted action within a few weeks of each other of every major hospital chain in the United States implementing the same policy; an irrational, unwise, and unfathomably expensive policy that will result in the termination of centuries of accumulated institutional employee knowledge and expertise, will leave the hospitals short-staffed, and will potentially manufacture through intentional action the very same healthcare crisis most feared for the first twenty months of the pandemic.

The federal government's coercion of private actors to undertake a traditional public health function makes the private actors into state actors under long-standing

Eleventh-circuit law. It is axiomatic that the government may not accomplish indirectly through private action what it may not do directly as a government actor.

There are three tests for determining when a private party is acting under color of state law. The Public Function Test, the State Compulsion Test, and the Nexus/Joint Action Test. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1276-77 (11th Cir. 2003). The tests are disjunctive — a private actor will be found to be state actor if any of the three tests apply. While Defendants are state actors under *all three* tests, this memorandum will explain why the Public Function Test and the State Compulsion Test are undeniably satisfied.

Defendants are subject to constitutional limitations when they act as a state actor. *See Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993) ("A private hospital is subject to the provisions of 42 U.S.C. § 1983 and the Fourteenth Amendment only if its activities are significantly affected with state involvement," internal cites, quotes, brackets omitted).

Finally, Defendants have run roughshod over many of the Plaintiffs' sincerely-held religious beliefs by categorically denying their requests for religious accommodation. Under 42 U.S.C. § 1983 and either Title VII or the Florida Civil Rights Act, Plaintiffs are entitled to injunctive relief before they experience irreparable harms.

<u>B. The Defendants Are State Actors Under the Public Function Test</u>

"The public function test limits state action to instances where private actors are performing functions traditionally the exclusive prerogative of the state." *Willis*, 993 F.3d at 840 (internal quotes omitted).

Last month, the White House outlined its "six-pronged, comprehensive national strategy" to combat the Covid-19 pandemic:[2]

> President Biden is implementing a six-pronged, comprehensive national strategy that employs the same science-based approach that was used to successfully combat previous variants of COVID-19 earlier this year. This plan will ensure that we are using every available tool to combat COVID-19 and save even more lives in the months ahead, while also keeping schools open and safe, and protecting our economy from lockdowns and damage.
>
> VACCINATING THE UNVACCINATED
>
> Since January, the Administration has taken actions to make vaccination conveniently available to all. COVID vaccines have been available to every individual age 16 and older since April 19th and to those age 12 and older since May. The Administration took steps to make vaccines available at over 80,000 locations nationwide, worked with pharmacies to offer walk-in appointments, and **put out a call to action to businesses and organizations across the nation**.

The White House, "Path out of the Pandemic: President Biden's Covid-19 Action Plan" (emphasis added).

---

[2] *See* The White House, "Path out of the Pandemic: President Biden's Covid-19 Action Plan," /available at:/ https://www.whitehouse.gov/covidplan/.



Implementing and enforcing a broad vaccination mandate "across the nation" in response to a pandemic is traditionally a public function that is the exclusive prerogative of the state. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020), 141 S. Ct. 10, 12, 208 L.Ed.2d 155, 156 (2020) ("Our Constitution principally entrusts the safety and the health of the people <u>to the politically accountable officials of the States</u> to guard and protect.") (emphasis added, quotes omitted); *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 25 S. Ct. 358, 362 (1905) ("[I]t is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, <u>as the safety of the general public may demand</u>," emphasis added).

The vaccines are the property of the federal government. They remain the property of the federal government right up until they are injected into citizens' bodies:[3]

> At this time, all COVID-19 vaccine in the United States has been purchased by the United States Government for administration exclusively by enrolled providers through the CDC COVID-19 Vaccination Program. Vaccine remains U.S. government property until administered to the vaccination recipient.

---

[3] *CDC Website*, available at https://www.cdc.gov/vaccines/covid-19/provider-enrollment.html.

So, the Vaccine Mandate is intended to assist the federal government with delivering its property into the bodies of citizens, including the Plaintiffs. The Covid drugs are the property of the federal government until the very moment they are injected into employees. In other words, the Defendants are merely agents of the federal government, working in concert with it to effectuate the *government's* stated policy.

As discussed in the Declaration of Dr. Neu,[4] the vaccines do not prevent the spread of the virus. They do not — cannot —protect patients and staff from becoming infected. In other words, the incremental vaccination of an additional employee does not confer any meaningful benefit to the Defendants or their patients. At best, the vaccines can only provide an individual therapeutic advantage to the *recipient* of the injection. The Defendants' broad, undifferentiated, non-individualized vaccination policy does not reduce the spread of the virus in the hospitals, or prevent patient or staff infections, but serves only to help further the government's stated goal of reaching certain broad population rates of vaccination.

At minimum, the Vaccine Mandate constitutes performance of a public function — delivery of federally owned vaccines to achieve threshold levels of population compliance — with the government's acquiescence. *See, e.g., Marsh v. Alabama*, 326 U.S. 501, 507, 66 S. Ct. 276, 279 (1946) ("And even had there been

---

[4] Filed contemporaneously herewith.

no express franchise but mere acquiescence by the State in the corporation's use <u>of its property</u> … operation of all the highway … would still have been performance of a public function," emphasis added).

The Defendants were doing just fine without the Vaccine Mandate. Ascension Group operated throughout the worst of the pandemic in 2020 and most of 2021 without a Vaccine Mandate, during which time many if not most of its staff were exposed to the Covid virus — and achieved a net operating income of $668 million dollars, or $957 million including investment income.[5]

Furthermore, in July 2021, the State of Florida passed SB 2006, which added complete liability protection for Defendants from claims related to Covid-19 so long as they make a good-faith effort to substantially comply with authoritative or controlling government-issued health standards or guidance.[6] Fla. Stat. § 768.38. Thus, Defendants have no articulable financial business purpose for enforcing the Vaccine Mandate. They can't be sued if a patient contracts Covid in their hospitals.

---

[5] *See* "Ascension latest nonprofit to rebound with $5.7B net income for 2021," *available at*: https://www.fiercehealthcare.com/hospitals/ascension-latest-nonprofit-to-rebound-5-7b-net-income-for-2021, *and* Healthcare Dive, "Investments drive Ascension to income of $957M, despite dampened patient volumes," *available at*: https://www.healthcaredive.com/news/investments-drive-ascension-to-income-of-957m-despite-dampened-patient-vo/600923/.

[6] The statute provides that, "If the court determines that the defendant made such a good faith effort, the defendant is *immune* from civil liability." § 768.38(3)(c)(2)(b), Fla. Stat. (emphasis added).

The Defendants are state actors under the Public Function Test since they are undertaking public health functions traditionally the exclusive prerogative of the state.

## C. The Defendants Are State Actors Under the State Compulsion Test

"The state compulsion test limits state action to instances where the government has <u>coerced</u> or at least <u>significantly encouraged</u> the action alleged to violate the Constitution." *Willis*, 993 F.3d at 840 (internal quotes omitted, emphasis added).

President Joe Biden began lobbying private companies like the Ascension Group to coerce employees into accepting vaccinations in July – just before the Vaccine Mandate was announced:[7]

> The President announced vaccination requirements for the federal government **in July and called on the private sector to do more to encourage vaccination as well**. **Since that time**, employers, schools, nursing homes, restaurants, **hospitals**, and cities in all 50 states **have announced new vaccination requirements. Since July, the share of job postings that require vaccination are up 90%. And we know these requirements work**.

> … The President's plan will reduce the number of unvaccinated Americans by **using regulatory powers and other actions** to substantially increase the number of Americans covered by vaccination requirements—**these requirements will become dominant in the workplace**.

---

[7] *See* The White House, "Path out of the Pandemic: President Biden's Covid-19 Action Plan," /available at:/ https://www.whitehouse.gov/covidplan/.

The White House, "Path out of the Pandemic: President Biden's Covid-19 Action Plan" (emphasis added).

Under the headline, "Requiring Covid-19 Vaccinations for Over 17 Million Health Care Workers," the White House's website explains how the federal government will coerce hospitals like the Defendants to comply with its vaccination objective:

> The Centers for Medicare & Medicaid Services (CMS) is taking action to require COVID-19 vaccinations for workers in most health care settings that receive Medicare or Medicaid reimbursement, including but not limited to hospitals, dialysis facilities, ambulatory surgical settings, and home health agencies. This action builds on the vaccination requirement for nursing facilities recently announced by CMS, and will apply to nursing home staff as well as staff in hospitals and other CMS-regulated settings, including clinical staff, individuals providing services under arrangements, volunteers, and staff who are not involved in direct patient, resident, or client care. These requirements will apply to approximately 50,000 providers and cover a majority of health care workers across the country. Some facilities and states have begun to adopt hospital staff or health care sector vaccination mandates. This action will create a consistent standard across the country, while giving patients assurance of the vaccination status of those delivering care.

On September 9, 2021, CMS published a press release on its website, recapitulating various public statements by the Biden Administration over the previous weeks:[8]

---

[8] *Available at* https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand-vaccination-requirements-health-care-settings.

The Biden-Harris Administration will require COVID-19 vaccination of staff within all Medicare and Medicaid-certified facilities to protect both them and patients from the virus and its more contagious Delta variant. Facilities across the country should make efforts now to get health care staff vaccinated to make sure they are in compliance when the rule takes effect.

The clear message, the "stick," is a threat to the Defendants' Medicare and Medicaid reimbursements — a substantial part of the Defendants' business. This is a significant threat. As far back as 2015, Medicare/Medicaid payments represented over 40% of Ascension's revenue, possibly much more.[9] And it is not an obscure threat. In August, the President announced that "nursing homes must vaccinate their staffs against COVID-19 <u>if they want to continue receiving federal funding</u>."[10]

Described as "one of the most powerful tools the Biden administration has at its disposal,"[11] are the Conditions of Participation and Conditions for Coverage, the federal health and safety standards that health care organizations must meet in order

---

[9] *See* Health Reform, "How Are Hospitals Faring Under the Affordable Care Act? Early Experiences from Ascension Health," *available at:* https://www.kff.org/health-reform/issue-brief/how-are-hospitals-faring-under-the-affordable-care-act-early-experiences-from-ascension-health/view/print/; *and see* KHN, "Checking In With Ascension Health, Largest Catholic Health System", *available at* https://khn.org/checking-in-with-ascension/ ("Today we have maybe 40% of our revenue from Medicare. As soon as the Baby Boom hits 2011, our Medicare revenues will go to 60%. We have 10% Medicaid today.")

[10] See USA Today, "President Biden says nursing homes must vaccinate workers against COVID-19," *available at:* https://www.usatoday.com/story/news/politics/2021/08/18/biden-announce-nursing-homes-must-vaccinate-workers-against-covid-19/8183943002/.

[11] See Center for American Progress, "Mandatory COVID-19 Vaccination for Health Care Workers as a Condition for Medicare and Medicaid Participation," *available at*: https://www.americanprogress.org/issues/healthcare/news/2021/08/06/502409/mandatory-covid-19-vaccination-health-care-workers-condition-medicare-medicaid-participation/.

to participate and receive funding from the Medicare and Medicaid programs. Under Section 1861(e) of the Social Security Act, the secretary of the U.S. Department of Health and Human Services has the authority to adopt any proposed Conditions of Participation that are found to be "necessary in the interest of the health and safety of the individuals who are furnished services in hospitals." Other health care providers must similarly meet health and safety standards.

CMS has stated that the federal vaccination requirements will be a condition of participating in the Medicare and Medicaid programs and will be issued through emergency regulations as an Interim Final Rule with a Comment Period expected to be published sometime in October 2021. The new rule is expected to build upon the previous rule regulating vaccination of nursing home staff — making federal payments contingent on compliance. Defendants are powerless to resist these edicts, and depending on the language of the final rule, may not have sufficient time to come into compliance. As the government has exhorted, they have to start now.

In addition to the threat to cut off Medicare/Medicaid funding, the government also offers a carrot. Ascension's Management's Discussion and Analysis of Financial Condition and Results of Operations for Ascension for the year ending July 2021 disclosed that the Ascension "System received **$1.8 billion** of distributions from the Provider Relief Fund [established under the CARES Act] during both the fiscal years ended June 30, 2021 and 2020." Copy attached as **Exhibit A**. Page 20

of Ascension's Consolidated Financial Statements (Q4) for Fiscal Year 2021 discloses that "Payments from the Provider Relief Fund are to be used to prevent, prepare for, and respond to coronavirus, and shall reimburse the recipient for health care related expenses and lost revenues attributable to coronavirus." Copy attached as **Exhibit B**.

So long as the Defendants comply with federal objectives for "prevent[ing], prepar[ing] for, and respond[ing] to coronavirus," they stand to receive billions in federal aid. But if they refuse to coerce their employees into accepting unwanted medical treatments, Defendants not only stand to lose all their Medicare/Medicaid reimbursements but also all their federal Covid relief. Defendants have no choice but to comply.

In *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602 (1989), regulations that authorized, but did not require, breath and urine tests be given by railroads to employees who violated safety rules made railroads state actors for Fourth Amendment purposes where the regulations left Railroads no choice because they (1) pre-empted state laws on the same subject; (2) "supercede[d] any provision of a collective bargaining agreement, or arbitration award construing such an agreement"; (3) allowed the Federal Railroad Administration "to receive certain biological samples and test results procured by railroads pursuant to [the

regulations]"; and where the (4) covered employees could not refuse the railroad's "request to submit to breath or urine tests[.]" *Id.* at 615.

The fact that the CMS rules have not yet been passed is irrelevant. Threats of future action by government agents against private actors have been sufficient to establish state action. In *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987), the Court found state action where a deputy county attorney informed Mountain Bell that Arizona criminal law prohibited Mountain Bell from carrying Carlin's messages on its network, and "advised Mountain Bell to terminate Carlin's service and threatened to prosecute Mountain Bell if it did not comply." *See also Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment <u>or adverse regulatory action</u> will follow the failure to accede to the official's request, a valid claim can be stated," emphasis added).

It is manifestly apparent that but for the encouragement and coercion of the federal government, the Defendants would not undertake such a destructive and irrational policy as terminating a substantial number of longstanding critical healthcare workers in the midst of a pandemic. It is utterly irrational without the federal government's myriad policies designed to stimulate and coerce Defendants into adopting the Vaccine Mandate. In other words, like scores of large businesses

all across the United States in every type of large corporation dependent on federal money or regulation,[12] the federal government has entered into the Defendants' decision-making process, such that the Defendants' choices may be deemed those of the federal government. *Cohen v. World Omni Fin. Corp.*, 457 Fed. Appx. 822, 828 (11th Cir. 2012), *citing Langston ex rel. Langston v. ACT*, 890 F.2d 380, 385 (11th Cir. 1989).

The Defendants are state actors under the State Compulsion Test, since they have been compelled and significantly encouraged by the federal government to violate the Plaintiffs' Constitutional rights.

### D. This Court Must look to Florida Law When Evaluating the Vaccine Mandate

The United States Supreme Court has directed lower courts to test a compelled vaccination law against the constitution of the individual state. *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905).

### E. The Vaccine Mandate Violates the Plaintiffs' Constitutional Right to Privacy

As state actors, Defendants are subject to constitutional limitations. Florida law provides that compelling an unwanted "medical treatment" violates Florida's fundamental right to privacy and citizens' right to refuse unwanted medical

---

[12] See, e.g., Southwest Airline's vaccine mandate, even though CEO Gary Kelly said he has "never been in favor of corporations imposing that kind of a mandate. I'm not in favor of that, never have been." *Available at* https://www.cnbc.com/2021/10/12/covid-vaccine-southwest-ceo-gary-kelly-says-he-never-wanted-a-mandate.html. It is patently absurd to believe that only some employers have been coerced by federal vaccine policy.

treatments. Art. I, § 23, Fla. Const.; *Green v. Alachua Cty.,* --- So.3d ---, 2021 WL 2387983 (Fla. 1st DCA 2021); *Machovec v. Palm Beach Cty.*, 310 So. 3d 941 (Fla. 4th DCA 2021). "[A]ny compelled intrusion into the human body implicates significant, constitutionally protected privacy interests." *Missouri v. McNeely*, 569 U.S. 141, 143 (2013).

"If a challenged law *implicates* Florida's right to privacy, the burden shifts to the government to prove that the law furthers a compelling state interest in the least restrictive way"—also known as the "strict scrutiny" standard. *Green*, 2021 WL at *6 (*citing Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1260 (Fla. 2017)). This "strict scrutiny" standard applies equally when the government enforces laws, and for government action when it enforces workplace policies as an employer. *See City of N. Miami v. Kurtz*, 653 So. 2d 1025, 1028 (Fla. 1995).

The Vaccine Mandate is a medical treatment which, when unwanted, violates Plaintiffs' right to refuse medical treatment. *See Green*, 2021 WL at * 7 ("the supreme court has construed this fundamental right to be so broad as to include the complete freedom of a person to control his own body."). It invades Plaintiffs' privacy. By their nature, vaccines extend far beyond the workplace into "a person's private or home life," "alter one's physical person," and permanently modify a citizen's corporeal being — the opposite of a "temporary and *de minimus* interference[.]" *Id.* at *33 (Lewis, J. dissenting).



The Defendants' Vaccine Mandate facially interferes with its employees' right to refuse unwanted medical treatments, implicates Plaintiffs' fundamental right to privacy, and is "presumptively unconstitutional." *Green*, 2021 WL at *5, 10.

## F. Defendants Have the Burden of Proving the Vaccine Mandate Meets Strict Scrutiny

Under Florida law, if a challenged policy implicates a privacy right, the burden shifts to the state actor "to prove that the law further[s] a compelling state interest in the least restrictive way." *Gainesville Woman Care*, 210 So. 3d at 1260. When the state actor fails to offer evidence to demonstrate a compelling state interest, the trial court then is absolved of having to make any finding to that effect. *See id.* at 1260–61.

The Vaccine Mandate also violates Plaintiffs' fundamental right to privacy guaranteed by the federal Constitution and secured by the Fourteenth Amendment. "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment[.]" *Cruzan by Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261, 278 (1990). "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990). *See also Washington v. Glucksberg*, 521 U.S. 702, 725 (1997) ("Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to

refuse unwanted medical treatment, our assumption was entirely consistent with this Nation's history and constitutional traditions.").

Federal law agrees with Florida law. "Every violation of a person's bodily integrity is an invasion of his or her liberty ... any such action is degrading if it overrides a competent person's choice to reject a specific form of medical treatment." *Harper*, 494 U.S. at 237 (Stevens, J., concurring in part). "Governmental actions that infringe upon a fundamental right receive strict scrutiny." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1208 (9th Cir. 2005), as amended by 447 F.3d 1187 (9th Cir. 2006). Accordingly, the Vaccine Mandate is subject to strict scrutiny and must be struck down unless it "advance[s] a compelling state interest by the least restrictive means available." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

The threat of termination of employment is coercive. *See, e.g., Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Rick Scott*, 717 F.3d 851, 874 (11th Cir. 2013) ("In effect, the State is offering its employees this Hobson's choice: either they relinquish their Fourth Amendment rights and produce a urine sample which carries the potential for termination, or they accept termination immediately … To begin with, we do not agree that employees' submission to drug testing, on pain of termination, constitutes consent under governing Supreme Court case law"). "Employees who must submit to a drug test or be fired are hardly acting voluntarily, free of either express or implied duress and coercion." *Id*.



The Plaintiffs, who must all submit to vaccination "or be fired[,] are hardly acting voluntarily, free of either express or implied duress and coercion." *Id.*

In *Green v. Alachua Cty.*, 2021 WL 2387983 (Fla. 1st DCA 2021), Florida's First DCA found that mask mandates are presumptively unconstitutional because they violate citizens' constitutional right to privacy. "The right of privacy is a fundamental one, expressly protected by the Florida Constitution, and any law that implicates it is presumptively unconstitutional, such that it must be subject to strict scrutiny and justified as the least restrictive means to serve a compelling governmental interest." *Id.* The Vaccine Mandate is much more invasive than the mask mandate evaluated in *Green*.

The Plaintiffs are substantially likely to prove that the Vaccine Mandate is presumptively unconstitutional under Florida's Right to Privacy, Art. I, § 23, Fla. Const., and under the 14th Amendment of the Constitution. Therefore, the Defendants must prove that the Vaccine Mandate furthers a compelling state interest using the least restrictive means, which they cannot do, not least because they are already accommodating some medical and religious exemption requests.

G. Title VII and Florida Civil Rights Act Claims Apply to the Defendants

Although Defendant hospitals are "religious organizations," they remain liable for discriminatory conduct under Title VII regarding employees — like the Plaintiffs — who are not essential to the Defendants' spiritual and pastoral mission:



> The ministerial exception preserves a church's "essential" right to choose the people who will preach its values, teach its message, and interpret its doctrines, both to its own membership and to the world at large, free from the interference of civil employment laws. Although the doctrine usually comes into play in employment suits between an ordained minister and her church, it extends to any employee who serves in a position that is important to the spiritual and pastoral mission of the church.

*Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1243 (10th Cir. 2010) (internal cites, quotes, brackets omitted). See also *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985) ("This approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church") cited for this proposition by *Ross v. Metro. Church of God*, 471 F. Supp. 2d 1306, 1308 (N.D. Ga. 2007).

Unlike Title VII, the Florida Civil Rights Act does not include any broad exclusion for religiously-based organizations as such, but only as to those organizations which <u>condition employment</u> on a particular faith tradition:

> This section shall not apply to any religious corporation, association, educational institution, or society which **conditions** opportunities in the area of employment or public accommodation to members of that religious corporation, association, educational institution, or society or to persons who subscribe to its tenets or beliefs.

§ 760.10, Fla. Stat. Ann. (emphasis added).



Since the Defendants do not condition employment on subscription to Catholic tenets or beliefs, they are not exempt under the Florida Civil Rights Act.

### H. Defendants Have Discriminated Against Plaintiffs by Failing to Provide Religious Accommodations to the Vaccine Mandate

Following receipt of the Plaintiffs' demand letters, the Defendants now appear to be backpedaling and attempting to revive previously "refused" religious accommodation requests — after the Defendants' drop-dead October 12 deadline for such request. At the time of drafting this Memorandum, one of the Plaintiffs reported the new development as follows:

> So I just checked my HR case for exemption so I could try to save the document. It had said "closed" not long ago and was in the completed area. It now says "work in progress" and back in the pending area. It doesn't take me anywhere when I click on it and I did receive denial emails. My manager did talk with me saying he is backing me and can't afford to lose me and has been trying to talk to higher ups. Maybe something is happening 🤔

Obviously, whether a manager "can afford to lose" someone is irrelevant to the consideration of whether an employee is entitled to a religious accommodation.



Title VII of the Civil Rights Act prohibits Defendants from discriminating against Plaintiffs because of their sincerely held religious beliefs. 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . religion . . . .").

In 2017, the Attorney General of the United States published a memorandum titled "Federal Law Protections for Religious Liberty." The AG's memo begins by reciting the primary significance of religious liberty in the United States:[13]

> Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of federal law. As James Madison explained in his Memorial and Remonstrance Against Religious Assessments, the free exercise of religion "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society." Religious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place. It also encompasses religious observance and practice. Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming.

---

[13] Federal Law Protections for Religious Liberty, 82 Fed. Reg. 49668-01, 49668 (Oct. 26, 2017).

> … In the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences. It is a fundamental right.

By broadly denying Plaintiffs' requests for religious accommodation, Defendants are violating federal law's requirement that sincerely held religious belief be protected and accommodated. 42 U.S.C. § 2000e-2(a). Florida law guarantees employees in corporations with more than 15 employees similar protections for their religious liberties. *See* Florida Statutes §§ 760.01-760.11 and 509.092 (the "Florida Civil Rights Act of 1992").

Under Title VII and the Florida Civil Rights Act, Defendants must provide religious exemptions and accommodations to those with sincerely held religious objections to the Vaccine Mandate, especially where those employees — like the Plaintiffs — are not part of the Defendants' religious or pastoral mission.

## I. Plaintiffs Meet the Elements Necessary for Preliminary Injunctive Relief

Plaintiffs seek an emergency temporary restraining order, a preliminary injunction, and a permanent injunction against the Defendants, their agents, affiliates, subsidiaries, and all persons acting in concert with them (the "Enjoined Parties") pursuant to Rule 65 that (a) bars the Enjoined Parties from terminating the employment of or disciplining any employees subject to the Vaccine Mandate; and (b) bars the Enjoined Parties from terminating the contract of any other party for failing to comply with the Vaccine Mandate.



Plaintiffs specifically exclude weekly Covid testing or a reasonable, non-discriminatory face mask requirement from any prohibitory injunction.

"To be entitled to injunctive relief, the moving party must establish that (1) there is a substantial likelihood that he ultimately will prevail on the merits of the claim; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the public interest will not be harmed if the injunction should issue." *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983), *certified question answered*, 450 So. 2d 224 (Fla. 1984).

## 1. Irreparable Harm

Both federal courts and Florida district courts of appeal have presumed irreparable harm when fundamental rights are violated. *See, e.g., Gainesville Woman Care*, 210 So.3d at 1263–64 (holding that given the likelihood of the law's unconstitutional impingement on privacy, there could be no adequate remedy at law for its enforcement; the law's mere "enactment would lead to irreparable harm"; and enjoining the enforcement of a law encroaching a fundamental constitutional right would serve the public interest); *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) (irreparable harm presumed in Title VII cases); *Cunningham v. Adams*, 808 F.2d 815, 822 (11th Cir. 1987) (stating that the injury suffered by the plaintiff is irreparable only if cannot be undone through monetary remedies); *Cate*



*v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (irreparable injury presumed from violation of First Amendment rights "for even minimal periods of time"); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring) ("a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.").

Similarly, irreparable harm is presumed when personal rights — like those available under Title VII and the Florida Civil Rights Act — are deprived. "The deprivation of personal rights is often equated with irreparable injury and serves as an appropriate predicate for injunctive relief." *See, e.g., Branti v. Finkle*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (injunctive relief to prevent dismissal from public employment because of political beliefs); *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979), aff'd, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (injunctive relief to permit solicitation in shopping center); *Bright v. Pittsburgh Musical Soc'y*, 379 Pa. 335, 108 A.2d 810 (1954) (injunctive relief to prevent blacklisting of entertainer); 17 Fla.Jur. Injunctions § 30; 43A C.J.S. Injunctions § 149; 14 C.J.S. Civil Rights Supp. § 94." *Hitt v. N. Broward Hosp. Dist.*, 387 So. 2d 482 n. 3 (Fla. 4th DCA 1980); *Green v. Alachua Cty.*, 2021 WL 2387983 (Fla. 1st DCA 2021) (mask mandates are presumptively unconstitutional).

Courts have also found that no adequate remedy at law exists when constitutional rights are infringed. *See Tucker v. Resha*, 634 So.2d 756, 759 (Fla. 1st DCA 1994) (concluding that money damages are not available for violations of the privacy provision of the Florida Constitution); *Thompson v. Planning Comm'n of Jacksonville*, 464 So.2d 1231, 1237 (Fla. 1st DCA 1985) (where calculation of damages is speculative, legal remedy is inadequate); *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1263–64 (Fla. 2017) (defendants conceded the unavailability of an adequate remedy at law if the law went into effect and was found to be unconstitutional).

Finally, due to the statutory liability protection provided Defendants by § 768.38, Florida Statutes, the Plaintiffs lack access to money damages. Even absent the constitutional issues, the Plaintiffs will be irreparably harmed by the Vaccine Mandate, as they have no other recourse.

## 2. Likelihood of Prevailing on the Merits

Plaintiffs are substantially likely to prevail on the merits because, as described above, the Defendants are state actors under two if not all three of the applicable tests. Therefore, Defendants' Vaccine Mandate is subject to the demanding strict scrutiny standard.

Defendants cannot even show that the Vaccine Mandate meets rational basis. They certainly cannot meet the high burden of showing the Vaccine Mandate

satisfies the strict scrutiny standard, which they must do because the Vaccine Mandate invades the Plaintiffs' fundamental rights of privacy and bodily autonomy. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) ("As the Government bears the burden of proof on the ultimate question of . . . constitutionality, [Plaintiffs] must be deemed likely to prevail unless the [state actor] has shown that [their] proposed less restrictive alternatives are less effective than [the mandate]").

The Defendants' Vaccine Mandate is far more intrusive and offensive to privacy and bodily integrity than was the county's mask mandate in *Green*. The Defendants' Vaccine Mandate is even stricter than the proposed federal OSHA mandate, which includes a weekly testing alternative to vaccination.

Plaintiffs are similarly likely to prevail on the merits regarding their state and federal claims related to the denials of their religious exemptions. Defendants have no right to weigh or evaluate Plaintiffs' assertions of qualifying sincerely-held religious beliefs under applicable law. *See e.g. Thomas v. Review Bd. of Ind. Emp't. Sec. Div.*, 450 U.S. 707, 714 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others"). And since they have already accommodated Plaintiffs for twenty months of the pandemic without vaccines, the Defendants cannot now claim an undue burden.[14] Because Defendants have rejected

---

[14] Defendants *especially* cannot claim any undue burden to accommodate those Plaintiffs having natural immunities.

the religious exemptions of all the Plaintiffs through boilerplate *en masse* denials, Defendants cannot possibly articulate any principled basis for refusing to accommodate the Plaintiffs' religious beliefs.

### 3. Balancing of Harms

A state actor "is in <u>no way</u> harmed by the issuance of an injunction that prevents the state [actor] from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011) (emphasis added). Furthermore, the Defendants have already operated successfully through the worst of the pandemic absent the Vaccine Mandate.

### 4. Public Interest

The public interest favors protection of citizens' constitutional rights and liberties. *See Gainesville Woman Care*, 210 So.3d at 1263-64 (given the likelihood of the law's unconstitutional impingement on privacy, there could be no adequate remedy at law for its enforcement; the law's mere 'enactment would lead to irreparable harm'; and enjoining the enforcement of a law encroaching a fundamental constitutional right would serve the public interest). Similarly, under federal law, enjoining an unconstitutional and discriminatory mandate poses no harm to Defendants. They have no legitimate interest in the implementation of an unlawful policy. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d

Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law").

### 5. Bond Requirement

No bond is necessary here, and the public interest lies in dispensing with the bond. The Plaintiffs request that the Court waive the bond requirement.

### 6. Request for Hearing

Plaintiffs respectfully request that, if the Court is not inclined to grant an emergency TRO, this Court set a hearing on this matter allowing sufficient time prior to November 12, 2021, the Mandatory Vaccination Deadline.

## CONCLUSION

As stated herein, Plaintiffs will be irreparably harmed absent immediate injunctive relief, Plaintiffs lack any adequate remedy at law, there is a substantial likelihood that Plaintiffs will prevail on the merits, and an injunction will not disserve any public interest.

Plaintiffs request that this Court immediately issue a temporary restraining order ("TRO") while this Motion is pending for the purpose "of preserving the status quo and preventing [the] irreparable harm" that is occurring and will continue to occur if Defendants' Vaccine Mandate is allowed to remain in effect, as the mandatory deadline is just days away. *Granny Goose Foods, Inc. v. Bhd. of*

*Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974).

Plaintiffs are likely to succeed on the merits, are likely to suffer irreparable harm in the absence of a TRO, and the balance of equities and public interest favor a TRO.

What makes a TRO especially necessary here is the proximity to the filing of the Motion of the Mandatory Deadline of November 12, 2021. The Mandatory Deadline is likely to come and go before the preliminary injunction will be fully briefed and necessary evidence obtained. Vaccination is irreversible. The Vaccine Mandate seeks to coerce Plaintiffs into undergoing an irreversible, invasive medical procedure — an experience that cannot be undone. Time is of the essence. The deadline for employees to receive their first Pfizer or Moderna vaccine has already passed, but the next deadline for them to receive their second dose (or their first and only dose of the Johnson & Johnson vaccine) is just days away. Because of the Vaccine Mandate's imminent timeline, Plaintiffs are suffering, and will continue to suffer, irreparable harm in the absence of a TRO.

Plaintiffs respectfully request that the Court enter a temporary restraining order, a preliminary injunction, and a permanent injunction against the Defendants, their agents, affiliates, subsidiaries, and all persons acting in concert with them (the "Enjoined Parties") pursuant to Rule 65 that (a) bars the Enjoined Parties from

terminating the employment of or disciplining any employees subject to the Vaccine

Mandate; and (b) bars the Enjoined Parties from terminating the contract of any other

party for failing to comply with the Vaccine Mandate.


Dated this 28th day of October, 2021.



CHILDERS LAW, LLC

2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel 866-996-6104   fax 407-209-3870
email jchilders@smartbizlaw.com

  /s/ Seldon J. Childers, Esq.    .
Florida Bar No. 61112
*Attorneys for Plaintiffs*


 BOATMAN RICCI

 /s/ James A. Boatman, Jr., Esq.
James A. Boatman, Jr., Esq.
Fla. Bar No. 130184
3021 Airport-Pulling Rd. N., Suite 202
Naples, Florida 34105
Email: CourtFilings@boatmanricci.com
(239) 330-1494 – Telephone
*Attorneys for Plaintiffs*



# <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished this day by electronic mail or U.S. Regular Pre-Paid Mail to the following:

Richard Margulies, Esq.
Jackson Lewis P.C.
501 Riverside Ave., Suite 902
Jacksonville, FL 32202
Richard.margulies@jacksonlewis.com

Sacred Heart Health System, Inc.
St. Vincent's Health System, Inc.
St. Vincent's Medical Center – Clay County, Inc.
St. Vincent's Ambulatory Care, Inc.
St. Vincent's Medical Center, Inc.
St. Luke's-St. Vincent's Healthcare, Inc.
c/o Corporation Service Company, Registered Agent
1201 Hays Street
Tallahassee, FL 32301-2525

Ascension Health Alliance
c/o CSC-Lawyers Incorporating Service Co., Registered Agent
221 Blivar St.
Jefferson City, MO 65101


   /s/ Seldon J. Childers, Esq.   .
Florida Bar No. 61112

